IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

WANDA MCCOY, et al.,

    **Plaintiffs,**

v.                                    CIVIL ACTION NO. 1:09-1271

SOUTHERN ENERGY HOMES, INC.,
et al.,

    **Defendants.**

<u>MEMORANDUM OPINION AND ORDER</u>

    Pending before the court is the motion for summary judgment filed by defendant The Bank of New York Mellon Corporation ("BNY").  (Doc. # 78).  For reasons expressed more fully below, that motion is GRANTED.

I.  <u>Background</u>

    Plaintiffs Wanda McCoy ("McCoy"), Christopher Justice, and Melinda Justice (collectively, "Plaintiffs") filed this action on October 1, 2009, asserting numerous claims relating to the purchase of a manufactured home from Defendant J.E.B. Quality Homes, Inc. ("J.E.B.") on October 15, 1997.  On November 20, 2009, the case was removed to federal court on the basis of diversity jurisdiction.  McCoy is the mother of Plaintiff Melinda Justice, who is married to Plaintiff Christopher Justice. The home was manufactured by Defendant Southern Energy Homes, Inc.

("Southern Energy"). Bank of New York is named in this lawsuit as the assignee of the underlying financing contract.[1]

At her deposition, Melinda Justice testified that she picked out the manufactured home that is the subject of this litigation. Deposition of Melinda Justice (hereinafter "M. Justice Depo. at _____") at 8 (portions attached as Exhibit E to BNY's Motion for Summary Judgment and Exhibit 1 to Plaintiffs' Response to BNY's Motion for Summary Judgment). Mrs. Justice stated that she looked at several other dealerships but eventually settled on the home at J.E.B. See id. at 11. At J.E.B., Justice dealt with J.E.B. salesman Mark Hatfield. See id. at 10-12. Of Mr. Hatfield's representations to her regarding the home, Mrs. Justice testified:

> Q:  What did the lot, the sales people, tell you about the home?
>
> A:  Like mom said, he was very outgoing.  He was just really friendly.  I don't know a lot about houses, I just - - I knew I liked it.  And he told us - - I do remember him telling us about the roof because it didn't have the shingles and that was something different.  But I couldn't see the roof from where I was at.  I didn't care about the roof.  I couldn't look up, so I didn't care.  And I remember him saying that the roof had a warranty on it, but that's really all I recall.
>
> Q:  You don't remember how long the warranty was?
>
> A:  Yes.  Years later after we started having trouble, we looked through what few papers we had.  But

---

[1] According to the Complaint, J.E.B. is defunct and dissolved.  First Amended Complaint at ¶ 8.

yeah, he told us that we had a 50-year warranty on the roof.

Q:   A 50?

A:   Yes.

Q:   Who was that that said that?

A:   Mark Hatfield.

Q:   Told you that you had a 50-year warranty on a roof?

A:   Yes.

                         * * *

Q:   So really it was basically your visual observation that you relied on when you purchased the home?

A:   Yes, and of course, you know, I think anytime you buy something, the salesperson always has a really good sales pitch.  I don't remember it, but he was - - he had lots of comments, you know, about what a good home it was and how well it was built.  The quality of wood that they use, something - - because I don't understand any of that.  But something about the boards, and I don't know what an OSB board is, but that is not what is in the floor.

     I don't know but he had lots of things to say.

Q:   Do you think some of them are false?

A:   Oh, yes.

Q:   Okay.  Tell me which ones.  Tell me which comments he made about the home that you think are false?

A:   The roof, the warranty on the roof.  As far as the rest of it, I really don't know, but . . .

M. Justice Depo. at 11-14.

3

Christopher Justice testified that he stopped at J.E.B. on his way home from work on several occasions to view the home with his wife.  Deposition of Christopher Justice (hereinafter "C. Justice Depo. at _____") at 17-23 (portions attached as Exhibit E to BNY's Motion for Summary Judgment and Exhibit 1 to Plaintiffs' Response to BNY's Motion for Summary Judgment).  According to Mr. Justice, he and his wife were looking for a bigger home because of their growing family.  See id. at 16.  Justice remembered dealing with Mark Hatfield from J.E.B.  See id. at 17, 22.  As to Hatfield's representations to him about the quality of the home, Christopher Justice testified:

> Q:   Did he ever make any representations about the
>      quality of the home?
>
> A:   He did, actually.  I recall him bragging on the
>      roof, the metal, it was kind of a new thing, the
>      metal roof.
>
> Q:   Do you remember specifically what he said?
>
> A:   Just that they are nice roofs, those metal
>      roofing.  I had never seen one or any of them.

Id. at 22-23.

Ultimately, the Justices decided to purchase the home and Christopher Justice filled out a credit application.  See id. at 20-21, 33-37.  The Justices were later informed that they would need a cosigner.  See id.  To that end, the Justices approached

4

John[2] and Wanda McCoy, Melinda's parents, who agreed to cosign the loan.  See id. at 33-37.

In her deposition, Wanda McCoy testified that she thought she was signing the paperwork in connection with the purchase of the home as a cosigner, not a buyer.  Deposition of Wanda McCoy (hereinafter "McCoy Depo. at _____") at 6-10 (portions attached as Exhibit E to BNY's Motion for Summary Judgment and Exhibit 1 to Plaintiffs' Response to BNY's Motion for Summary Judgment).  Mrs. McCoy couldn't remember if she had gone to the sales lot to look at the home with her daughter.  See id. at 8.  She also doesn't remember the substance of any conversations she may have had with the J.E.B. salesman.  See id. at 30-31.  According to Mrs. McCoy, she and her husband told the J.E.B. salesman "that we were there as cosigners."  Id. at 7.  With one exception, Mrs. McCoy admits that she and her husband signed the Installment Contract and all of the other documents associated with the purchase of the home. See id. at 31-36, 45, and 48.

The Purchase Contract related to the sale of the manufactured home was signed by Wanda McCoy and John McCoy.  See Exhibit A to BNY's Motion for Summary Judgment.  The Justices' signatures do not appear on the Purchase Contract.  See id.  The Purchase Contract also indicates that the McCoys were not trading in another home in connection with this purchase.  See id.  The

---

[2] Mr. McCoy is deceased.

Purchase Contract states that the manufactured home was subject to a "12 Month Limited Warranty by Factory."  Id.  The Purchase Contract also contains the following language: "THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING BETWEEN YOU AND ME AND NO OTHER REPRESENTATION OR INDUCEMENT, VERBAL OR WRITTEN, HAS BEEN MADE WHICH IS NOT CONTAINED IN THIS CONTRACT."  Id.

    In connection with the purchase of the home, both John and Wanda McCoy completed a credit application with BankAmerica.  See Exhibit B to BNY's Motion for Summary Judgment.  The credit application indicates that the McCoys sought to borrow $60,270 to purchase the manufactured home and planned to make a down payment of $6,700.  See id.  The credit application bears the signatures of both John and Wanda McCoy and is dated October 15, 1997.  See id.  In connection with their credit application, credit checks were completed on the McCoys.  See Exhibit C to BNY's Motion for Summary Judgment.  During her deposition, however, Mrs. McCoy indicated that the amount of income attributable to her and her husband on the Credit Application is overstated.  McCoy Depo. at 46-48.

    A Retail Installment Contract was signed by John and Wanda McCoy on October 14, 1997.[3]  See Exhibit D to BNY's Motion for Summary Judgment.  The Installment Contract indicates that the

---

[3] The record does not explain why the Installment Contract was dated a day earlier than the credit application.

6

amount to be financed by BankAmerica Housing Services was $60,270
to purchase a 1997 Southern Energy Model # SE653 manufactured
home, Serial No. PSE2L10022AB.  See id.  The Installment Contract
also lists John and Wanda McCoy as the only "buyers" of the
manufactured home.[4]  Finally, the Installment Contract indicates
that a down payment of $6,700 was being applied to the purchase
of the home.  See id.  The Certificate of Title prepared in
connection with the purchase, dated November 5, 1997, lists John
and Wanda McCoy as the owners of the home and BankAmerica Housing
Services as the first lienholder.  See Exhibit F to BNY's Motion
for Summary Judgment.  The Justices acknowledge they were given a
copy of the contracts and documents related to the purchase of
the home.  M. Justice Depo. at 15.

Despite the documentary evidence to the contrary,
Christopher Justice testified that he traded in a single-wide
manufactured home towards the purchase of the new Southern Energy
home.  C. Justice Depo. at 13-14, 132-33.  The title history for
the Justices' single-wide trailer shows that it was sold to
J.E.B. on March 11, 1998.  See Exhibit 2 to Plaintiffs' Response
to BNY's Motion for Summary Judgment.  Exhibit 2 also indicates
that the same trailer was subsequently sold by J.E.B. to Van and
Joyce Browning.  See id.  Wanda McCoy testified that the Down

_____

[4] The Installment Contract form contains space to list up to
four buyers.  See id.

7

Payment Certification that she and her husband signed is false because the McCoys did not make a cash down payment.  McCoy Depo. at 45.

After the home was delivered to the Justices' land,[5] it sat for approximately six weeks before J.E.B. completed the installation.  M. Justice Depo. at 16-17; C. Justice Depo. at 37-38.  After the manufactured home was set up, the Justices presented J.E.B. with a punch list of things that needed to be fixed.  M. Justice Depo. at 18; C. Justice Depo. at 56-59.  Eventually the repairs were made to the Justices' satisfaction.  C. Justice Depo. at 59.

The Justices moved into the house in late November/early December of 1997.  M. Justice Depo. at  17.  A roof cap that was damaged during transportation was replaced after the Justices moved into the house.  See id. at 19-22.  However, according to Melinda Justice, there were no other problems from the time they moved into the home in 1997 until 2009.  See id. at 22.  Christopher Justice likewise testified that after the initial repairs to the roof vent/cap were completed, there were no problems with the roof until 2009.  C. Justice Depo. at 47-48.

_____

[5] At the time the home was delivered, the land belonged to the McCoys.  After Mr. McCoy's death, Mrs. McCoy deeded the land to Chris and Melinda Justice.  McCoy Depo. at 37.

The Justices testified that, in March of 2009, after they had occupied the home for eleven years, they began to notice "water infiltration and mold accumulation." M. Justice Depo. at 24-27; C. Justice Depo. at 48-81.  In his deposition, Lamar Dickerson, testifying on behalf of Southern Energy, stated that, in his opinion, the roof on the manufactured home was not installed at Southern Energy's factory.  Deposition of Lamar Dickerson (hereinafter "Dickerson Depo. at ____") at 21, 45, and 49 (portions attached as Exhibit 1 to Plaintiffs' Response to BNY's Motion for Summary Judgment).  Mr. Dickerson also testified that the gutters on the home were installed incorrectly.  <u>See</u> <u>id.</u> at 46-47.  He further opined that the vents on the home were not those used by Southern Energy.  <u>See</u> <u>id.</u> at 103.

BNY does not agree with plaintiffs claim' that the home had a defective roof or that the roof was improperly repaired.  <u>See</u> Report of Francis Conlin (attached as Exhibit A to BNY's Reply Memorandum in Support of their Motion for Summary Judgment). BNY further disputes plaintiffs' contention that the sales contract and loan documents prepared in connection with the purchase of the home were incorrect because they omitted the Justices and reflect that Wanda McCoy and her husband were the only purchasers of the home.

Based on the foregoing, plaintiffs filed the instant lawsuit asserting claims for revocation of acceptance and rejection by

cancellation (Counts One and Two), breach of warranty (Counts Three, Four, and Five), breach of contract/breach of the implied duty of good faith and fair dealing (Count Six), unfair and deceptive trade practices (Count Seven), unconscionability (Count Eight), fraud (Count Nine), negligence (Count Ten), and strict product liability (Count Eleven) against defendants J.E.B., BNY, and Southern Energy[6].

On September 28, 2011, the court entered an order granting in part and denying in part the motion to dismiss filed by Bank of New York.  Counts Four (Breach of Implied Warranty of Merchantability), Five (Breach of Implied Warranty of Fitness), and Six (Breach of Contract) were dismissed as barred by the UCC's four-year statute of limitations.  The court also dismissed plaintiffs' claim for breach of the duty of good faith and fair dealing, finding that such a claim does not provide an independent cause of action under West Virginia law that is separate and apart from a breach of contract claim.  Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F. Supp.2d 631, 644 (S.D.W. Va. 2005).  The court found that plaintiffs' claim for breach of the duty of good faith and fair dealing was subsumed within their breach of contract claim under the UCC and,

---

[6] Plaintiffs accepted Southern Energy's offer of judgment, pursuant to Federal Rule of Civil Procedure 68.  On September 1, 2011, the Clerk entered judgment against Southern Energy in the amount of $20,000.00.

therefore, barred by the UCC's four-year statute of limitations. Finally, based on plaintiffs' withdrawal of their negligence and strict liability claims, Counts Ten and Eleven were dismissed.

In its motion for summary judgment, BNY argues that the Complaint should be dismissed in its entirety.  First, BNY contends that the FTC Holder Rule, and its West Virginia counterpart, prohibit plaintiffs from pursuing any claim against BNY because the facts of this case do not support a claim for rescission or restitution.  Next, BNY argues that the Justices do not have standing to pursue claims under the UCC because they are not "buyers" as that term is defined in W. Va. Code § 46-2-103(1)(a).  BNY's next argument is that plaintiffs' claims under the UCC are barred by the four-year statute of limitations.  BNY also contends that plaintiffs' claims under the West Virginia Consumer Credit and Protection Act ("WVCCPA") are barred by the Act's four-year statute of limitations.  BNY further contends that the Justices are not "consumers" under the WVCCPA and, accordingly, cannot pursue claims under that Act.  BNY also contends that plaintiffs failed to follow the statutory prerequisites for filing suit under the WVCCPA and that their failure to do so mandates dismissal of those claims, Counts Seven and Eight. Finally, BNY contends that, because plaintiffs cannot establish fraud by clear and convincing evidence, it is entitled to entry of judgment in its favor on the fraud claim.

## II.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, show that there is
> no genuine issue as to any material fact
> and that the moving party is entitled to
> a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could

12

> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

### III.  Analysis

A.   *Assignee Liability*

   1.   The FTC Holder Rule

   Pursuant to 16 C.F.R. § 433.2, every consumer installment
contract must include the following specific language:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS
> SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE
> DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS
> OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE
> PROCEEDS HEREOF.  RECOVERY HEREUNDER BY THE
> DEBTOR SHALL NOT EXCEED THE AMOUNTS PAID BY THE
> DEBTOR HEREUNDER.

16 C.F.R. § 433.2.  This language, commonly known as the "FTC
Holder Rule," aims to "to abrogate the holder-in-due-course
status[7] of financing companies with respect to retail installment

---

[7]        A "holder" is a person who is in
possession of a financial instrument made to
his order, or in blank.  W. Va. Code 46-1-201
[1979]. If a "holder" takes that note for
value, in good faith, without notice that it
is overdue or has been dishonored or of any
defense against it or claim to it on the part
of any person, then the holder is a 'holder
in due course'.  W. Va. Code 46-3-302 [1963].
If one is a holder in due course, then
implicitly one has no knowledge of any claims
arising from the instrument or defenses
against the collection under that instrument.

sales contracts that the financing companies have purchased from retail sellers." <u>Rollins v. Drive-1 of Norfolk, Inc.</u>, Civil Action No. 2:06cv375, 2006 WL 2519516, *2 (E.D. Va. Aug. 29, 2006).

> The policy rationale behind the Holder Rule is that financing companies are in a much better position to evaluate the risks of dealing with certain sellers than are individual consumers, and therefore are better suited to bear the risk that a given seller will have engaged in wrongful business practices.

<u>Id.</u> (citing 40 Fed. Reg. 53,505, 53,524 (1975)).  The installment contract at issue herein contains the Holder Rule language.

The Holder Rule "acts as a shield for consumers, protecting them from creditors by allowing non-payment when a seller has defrauded the consumer in some way." <u>Crews v. Altavista Motors, Inc.</u>, 65 F. Supp.2d 388, 390 (W.D. Va. 1999). However, in certain limited circumstances the Holder Rule "can also be used as a sword" allowing a buyer to maintain an affirmative action against an assignee.  <u>Id.</u>  The commentary to the Holder Rule makes clear that a buyer will be able to

---

> Once a holder is, in fact, a holder in due course, the only valid defenses against him are:  infancy, incapacity, duress, illegality of the transaction, fraud in the factum, or bankruptcy discharge on the part of the maker.  W. Va. Code 46-3-305 [1963].

<u>One Valley Bank of Oak Hill, Inc. v. Bolen</u>, 425 S.E.2d 829, 831 fn.2 (W. Va. 1992).

affirmatively assert claims against a holder only "where a
seller's breach is so substantial that a court is persuaded that
rescission and restitution are justified." Id. (citing 40 Fed.
Reg. 53,505, 53,524 (1975)).  In examining the effect of the FTC
Holder Rule in another case, this court concluded that "the FTC
holder rule permits consumers to assert affirmatively against a
subsequent holder of a note those claims that the consumer has
against the original lender . . . where the seller's breach is so
substantial that a court is persuaded rescission and restitution
are justified." Boggess v. Lewis Raines Motors, Inc., 20 F.
Supp.2d 979, 982 (S.D.W. Va. 1998) (Haden, J.).  Numerous courts
have likewise limited use of the Holder Rule to those situations
where the buyer's claim is asserted as a defense to a suit by the
creditor unless the facts of the case support a claim for
rescission or restitution.  See, e.g., Rollins at *5; Comer v.
Person Auto Sales, Inc., 368 F. Supp.2d 478, 490-91 (M.D.N.C.
2005); Crews at 390-91.

In determining whether rescission or restitution are
justified, the critical inquiry is whether "the seller's breach
renders the transaction practically worthless to the consumer."
Irby-Greene v. M.O.R., Inc., 79 F. Supp.2d 630, 635-36 (E.D. Va.
2000).  In the context of a contract for the sale of an
automobile, courts have found that if the buyer continues to use
the vehicle, "sustaining an affirmative claim under the FTC

15

Holder Rule may be difficult." <u>Comer</u> at 490.  As the <u>Comer</u> court

aptly noted, "to find the FTC Holder Rule available to consumers

without the limitations [discussed above] . . . is to make the

creditor an absolute insurer or guarantor of the seller's

performance." <u>Id.</u> at 490-91.  Given that the Justices continue

to live in the manufactured home, it cannot be said that the

transaction is "practically worthless" and, therefore, the facts

of this case do not support a claim for rescission or

restitution.

> 2.   <u>West Virginia Code § 46A-2-102</u>

The West Virginia counterpart to the FTC Holder Rule is

found at West Virginia Code § 46A-2-102.  That section provides:

> [A]n assignee of any such instrument, contract or
> other writing shall take and hold such
> instrument, contract or other writing subject to
> all claims and defenses of the buyer or lessee
> against the seller or lessor arising from that
> specific consumer credit sale or consumer lease
> of good or services. . . .
>
> * * *
>
> A claim or defense which a buyer or lessee may
> assert against an assignee of such instrument,
> contract or other writing under the provisions of
> this section may be asserted only as a matter of
> defense to or setoff against a claim by the
> assignee: Provided, That if a buyer or lessee
> shall have a claim or defense which could be
> asserted under the provisions of this section as
> a matter of defense to or setoff against a claim
> by the assignee were such assignee to assert such
> claim against the buyers or lessee, then such
> buyer or lessee shall have the right to institute
> and maintain an action or proceeding seeking to
> obtain the cancellation, in whole or in part, of
> the indebtedness evidenced by such instrument,

16

> contract or other writing or the release, in
> whole or in part, of any lien upon real or
> personal property securing the payment thereof.

W. Va. Code § 46A-2-102 (1) and (3).  The language of the statute itself makes clear that a buyer's ability to assert an affirmative claim against an assignee is not subject to the same limitations found in the FTC Holder Rule.  Indeed, West Virginia's highest court has specifically acknowledged:

> The buyer can assert a claim of defective product
> as a defense to the assignee's suit to collect
> the balance owed.  Ordinarily, this must be done
> as a defense or setoff to the assignee's claim.
> However, <u>if the assignee does not institute suit,
> the buyer may do so to obtain cancellation of the
> debt.</u>

<u>Chrysler Credit Corp. v. Copley</u>, 428 S.E.2d 313, 316 (W. Va. 1993) (emphasis added).

BNY is correct that <u>Copley</u> does not discuss the FTC Holder Rule.  However, the authorities cited by BNY in their discussion of the FTC Holder Rule do not mention W. Va. Code § 46A-2-102 or <u>Copley</u>.  Neither party mentions the obvious point: the FTC Holder Rule is not identical to West Virginia's rule, codified at W. Va. Code § 46A-2-102.  For this reason, the authorities cited by BNY discussing the FTC Holder Rule are of limited value in ascertaining the scope of § 46A-2-102, especially in light of <u>Copley</u>.  Specifically, West Virginia Code § 46A-2-102(3) and <u>Copley</u> permit a plaintiff to assert an action

seeking cancellation of a debt even if the assignee does not institute suit.

Based on the foregoing, the court concludes that, to the extent plaintiffs rely on the FTC Holder Rule to assert their claims against BNY, BNY is entitled to judgment in its favor. However, BNY's motion for summary judgment is denied to the extent it argues that W. Va Code § 46A-2-102 does not permit plaintiffs to pursue their claims against BNY.

B.    *Standing of Justices*

BNY contends that the Justices do not have standing to pursue their UCC claims (Counts One and Two) because they are not "buyers" as that term is defined in W. Va. Code § 46-2-103(1)(a). In Count One, plaintiffs seek to revoke acceptance of the manufactured home.  West Virginia Code § 46-2-608, the operative section, provides that a "<u>buyer</u> may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it . . . ."  In the alternative, in Count Two, plaintiffs seek to reject the contract pursuant to W. Va. Code § 46-2-601.  That section allows a "buyer" to reject goods "if the goods or the tender of delivery fail in any respect to conform to the contract. . . ."  W. Va. Code § 46-2-601.

The West Virginia UCC defines "buyer" as "a person who buys or contracts to buy goods."  W. Va. Code § 46-2-103(1)(a).

Notwithstanding the Justices' claims to the contrary, the Purchase Contract at issue herein demonstrates that the Justices were not parties to that contract.  The Justices, as the parties "claiming a breach, ha[ve] the burden of proving the contract's existence." Harman Investments, Ltd. v. Shah Safari, Inc., No. C10-0216RSL, 2010 WL 3522517, *2 (W.D. Wash. Sept. 7, 2010). They cannot meet their burden to show they were parties to the contract to buy the home at issue in light of the written evidence that suggests otherwise.  Cf. id. at 3 ("In this case, none of the documents identifies [defendant] as the purchaser or buyer. . . . In sum, there is no evidence that [defendant] contracted to buy goods or that the parties agreed its role encompassed being a buyer."); Reece v. Yeager Ford Sales, Inc., 184 S.E.2d 727, 731 (W. Va. 1971)("As Ford, the manufacturer, was not the seller of the automobile and was not a party to the contract of sale of the automobile by Yeager to the plaintiff, the plaintiff is not entitled to rescission of the sale as against Ford in this proceeding.").[8]  Based on the foregoing, the

---

[8] Specifically, the Justices cannot show there was a meeting of the minds between the Justices and J.E.B., the seller, that the Justices would in fact be the buyers of the home.  Even if the Justices testify that they were the true buyers of the home, they cannot meet their burden to show that J.E.B. was in agreement given the documentary evidence to the contrary.  "[T]he UCC has not obviated the basic requirement of a meeting of the minds to form a contract." Harman Investments, Ltd. v. Shah Safari, Inc., No. C10-0216RSL, 2010 WL 3522517, *2 (W.D. Wash. Sept. 7, 2010).

court concludes that the Justices were not "buyers" under the UCC and, therefore, they do not have standing to pursue Counts One and Two.

C.      *UCC Statute of Limitations*

BNY next argues that all plaintiffs' UCC claims are barred by the statute of limitations.  The manufactured home at issue in this litigation was purchased on October 15, 1997, and this lawsuit was filed almost twelve years later.

The statute of limitations applicable to claims brought pursuant to the UCC is four years.  That section provides:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

W. Va. Code § 46-2-725.

The court earlier dismissed Counts Four (Breach of Implied Warranty of Merchantability), Five (Breach of Implied

Warranty of Fitness), and Six (Breach of Contract) as barred by the four-year statute of limitations.[9]

    1.   Revocation of Acceptance[10]

West Virginia Code § 46-2-608, the operative section, provides in pertinent part:

---

[9] Plaintiffs have moved for relief from this Order, arguing that the court's decision was "clearly wrong." (Docs. #122 and 123). Plaintiffs' argue that the decision in Chrysler Credit Corp. v. Copley, 428 S.E.2d 313, 316 (W. Va. 1993), renders the UCC's statute of limitations irrelevant. Plaintiffs misread Copley.

As stated earlier, West Virginia Code § 46A-2-102(3) and Copley permit a plaintiff to assert an action seeking cancellation of a debt even if the assignee does not institute suit. Copley goes on to hold that "where a consumer is sued for the balance due on a consumer transaction, any asserted defense, setoff, or counterclaim available under the CCPA may be asserted without regard to any limitation of actions. . . ." Copley at 316; see also W. Va. Code § 46A-5-102 ("Rights granted by this chapter may be asserted as a defense, setoff or counterclaim to an action against a consumer without regard to any limitation of actions."). "This waiver of the statute of limitations for a buyer when sued for the balance due in a consumer transaction is one of the unique features of the CCPA." Id. at 316.

Copley is clear: only where a buyer/consumer is asserting claims in defense to a suit against him does the waiver of statute of limitations come into play. There is no waiver where, as here, the buyer is not being sued for the balance due in a consumer transaction. Accordingly, plaintiffs' motion for relief from order is DENIED.

[10] Revocation of acceptance under the UCC, when coupled with a request for cancellation of the contract under W. Va. Code § 46-2-711(1), approximates the same result as an action for rescission under prior law. It is generally recognized that the UCC has rejected the use of the term rescission. City Nat'l Bank of Charleston v. Toyota Motor Sales, 384 S.E.2d 374, 379 n.2 (W. Va. 1989).

> (1) The buyer may revoke his acceptance of a lot
> or commercial unit whose nonconformity
> substantially impairs its value to him if he has
> accepted it
>
> (a) on the reasonable assumption that its
> nonconformity would be cured and it has not been
> seasonably cured; or
>
> (b) without discovery of such nonconformity if
> his acceptance was reasonably induced either by
> the difficulty of discovery before acceptance or
> by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a
> reasonable time after the buyer discovers or
> should have discovered the ground for it and
> before any substantial change in condition of the
> goods which is not caused by their own defects.
> It is not effective until the buyer notifies the
> seller of it.

Plaintiffs' have directed the court to no authority that indicates the four-year statute of limitations for claims under the UCC does not apply to claims for revocation of acceptance. Indeed, given the nature of a claim for revocation of acceptance, it makes perfect sense that the statute of limitations governing claims for breach of contract and breach of warranty under the UCC should also control the time within which a buyer must bring a claim for revocation of acceptance.  See Highway Sales, Inc. v. Blue Bird Corp., 504 F. Supp.2d 630, 642-43 (D. Minn. 2007) ("[A] revocation-of-acceptance claim is a type of breach-of-contract claim; it is essentially a delayed rejection of nonconforming goods by the buyer . . .  Accordingly, Highway Sales's revocation-of-acceptance claim is subject to the four-year

22

statute of limitations found in UCC § 2-725(1). . . ."); <u>Snyder v. Boston Whaler, Inc.</u>, 892 F. Supp. 955, 959 (W.D. Mich. 1994) ("[P]laintiff's warranty claims are time-barred.  Plaintiff's revocation claim is barred as well, because plaintiff's right to revoke is based upon a finding that defendants breached a warranty.").

Based on the foregoing, the court finds that plaintiffs' claim for revocation of acceptance (Count One) is barred by the UCC's four-year statute of limitations.[11]

### 2.   Rejection by Cancellation

According to W. Va. Code § 46-2-207, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted. . . ."  It is clear that plaintiffs have "accepted" the manufactured home because the Justices have been living in it continuously for approximately 14 years.  <u>See</u> <u>Dixie Appliance Co. v. Bourne</u>, 77 S.E.2d 879, 880, Syllabus Pt. 2 (W. Va. 1953) ("Acts of a buyer of goods consistent only with ownership thereof, in absence of

---

[11] Even if the claim were not time-barred, it is clear that plaintiffs would not be able to prevail.  Revocation of acceptance must occur before there has been "any substantial change in condition of the goods which is not caused by their own defects."  W. Va. Code § 46-2-608.  The undisputed evidence is that the Justices have lived in the manufactured home since 1997. <u>Cf.</u> <u>Shreve v. Casto Trailer Sales, Inc.</u>, 149 S.E.2d 238, 243 (W. Va. 1966 ("If a buyer keeps the property and treats it as acceptable under the sale thereof, such as was done in the case at bar by living in the mobile home for four or five months and making several monthly payments, it would be construed as a waiver of his right to rescind and as accepting the property under the contract.").

explanation of such acts, constitute acceptance of the goods by the buyer.").  Accordingly, any attempt to now reject the home must fail.  In any event, a rejection by cancellation claim would be barred by the UCC's four-year statute of limitations.

3.  Breach of Express Warranty

Breach of warranty claims are also subject to the four-year statute of limitations and, in general, "[a] breach of warranty occurs when tender of delivery is made."  W. Va. Code  § 46-2-725(2).  There is, however, a future performance exception to the statute of limitations that provides "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered."  Id.

Plaintiffs contend that, prior to purchasing the home, Melinda Justice was informed that the roof had a 50-year warranty and, therefore, the future performance exception applies.  However, the Purchase Agreement provides that the only warranty was a 12-month limited warranty and does not mention a 50-year warranty.  Under West Virginia's parol evidence rule, "[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by

24

evidence of any other prior agreement or of a contemporaneous oral agreement."  W. Va. Code § 46-2-202; see also McCormick v. Jordon, 63 S.E. 778, 779 (W. Va. 1909) ("It is well settled that you cannot alter or deny a written contract by oral evidence."). For this reason, the future performance exception is not implicated and the breach of express warranties claim is time-barred.

D.      *Standing of Justices to Pursue WVCCPA Claims*

        In its motion for summary judgment, BNY argues that the Justices do not have standing to pursue Counts Seven and Eight which arise under the WVCCPA because they are not consumers under the terms of that Act.  The provision creating a private cause of action under the WVCCPA is § 46A-5-101(1), which pertinently provides:

> If a creditor has violated the provisions of this chapter applying to collection of excess charges, . . . [or] illegal, fraudulent or unconscionable conduct .  . ., the consumer has a cause of action to recover actual damages. . . .

"Consumer" is defined as "a natural person who incurs debt pursuant to a consumer credit sale or a consumer loan."  W. Va. Code § 46A-5-102(12).  This definition makes clear that the Justices are not consumers under the WVCCPA.  Simply put, they are not in debt to BNY.  Accordingly, they do not have an express cause of action under the WVCCPA.  See Bishop v. Quicken Loans, Inc., Civil Action No. 2:09-1076, 2011 WL 1321360, *11 (S.D.W.

Va. Apr. 4, 2011) (Copenhaver, J.); <u>see also</u> <u>In re Spurlock</u>,
Civil Action No. 3:10-1252, 2011 WL 2469830, *6 (S.D.W. Va. June
17, 2011) ("Although Mrs. Spurlock asserts she has a marital
interest in the house, it does not mean she is a consumer for
purposes of the loan.  As Mrs. Spurlock did not sign for the
loan, she cannot assert a claim as a consumer.") (Chambers, J.);
<u>Cather v. Seneca-Upshur Petroleum, Inc.</u>, Civil Action No.
1:09CV139, 2010 WL 3271965, *7-8 (N.D.W. Va. Aug. 18, 2010)
("While the plaintiffs, as they must, concede that they do not
qualify as `consumers' under the WVCCPA's definition, they
contend that such status is irrelevant because the scope of W.
Va. Code § 46A-6-104 is not limited to claims by consumers. . . .
Because the plaintiffs in this case are . . . not `consumers' as
defined in W. Va. Code §§ 46A-6-102(2) or 46A-1-102, the WVCCPA
does not provide them with a legal remedy in this case.");  Mem.
Op. and Order at 4, <u>Payne v. Green Tree Servicing, LLC</u>, No. 2:05-
cv-00293 (S.D.W. Va. Mar. 7, 2006) ("Ms. Payne clearly is not a
consumer pursuant to the WVCCPA.  She is not in debt to the
defendant, nor has the defendant ever accused her of being
indebted to it.") (Goodwin, J.).

     Based upon the foregoing, the court GRANTS BNY's motion
for summary judgment on Counts Seven and Eight as to the
Justices.

E.      *WVCCPA Statute of Limitations*

BNY also argues that any claims under the WVCCPA are time-barred under the four-year statute of limitations found in West Virginia Code 46A-5-101 which provides:

> With respect to violations arising from consumer credit sales or consumer loans made pursuant to revolving charge accounts or revolving loan accounts, or from sales as defined in article six [§ 46A-6-101 et seq.] of this chapter, no action pursuant to this subsection may be brought more than four years after the violations occurred. With respect to violations arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement.

Relying on <u>Dunlap v. Friedman's, Inc</u>., 582 S.E.2d 841 (W. Va. 2003), plaintiffs counter that the transaction at issue is a closed-ended credit transaction and, therefore, their action is still timely because it was brought within one year of the last scheduled payment.

Plaintiffs are correct that the WVCCPA claims are not time barred.  In <u>Dunlap v. Friedman's, Inc</u>., 582 S.E.2d 841, 846 (W. Va. 2003), the West Virginia Supreme Court of Appeals held that a consumer who is party to a closed-ended credit transaction, resulting from a "sale" as defined in WVCCPA, may bring any necessary action within either the four-year period commencing with the date of the transaction <u>or</u> within one year of

due date of last payment, whichever is later.[12]  Accordingly,
plaintiffs' WVCCPA claims are not time-barred.

F.      *Failure to Follow WVCCPA Prerequisites*

      BNY contends that plaintiffs failed to follow the
statutory prerequisites for filing suit under the WVCCPA and that
their failure to do so mandates dismissal of those claims, Counts
Seven and Eight.  The court agrees.  See Stanley v. Huntington
Bank, Civil Action No. 1:11CV54, 2012 WL 254135, *7 (N.D.W. Va.
Jan. 27, 2012) ("This Court agrees that . . . the plaintiff's
failure to comply with the mandatory prerequisite set forth in
Section 46A-6-106(b) bars her from bringing a claim.").

      West Virginia Code § 46A-6-106(b) provides:

> Notwithstanding the provisions of subsection (a)
> of the this section, no action may be brought
> pursuant to the provisions of this section until
> the consumer has informed the seller or lessor in
> writing and by certified mail of the alleged
> violation and provided the seller or lessor
> twenty days from receipt of the notice of
> violation to make a cure offer. . . .

---

[12] Whether or not one agrees with the result, the holding in
Dunlap is clear.  As the dissenting opinion in Dunlap noted: "In
this proceeding, the majority found that a consumer who is a
party to a closed-end credit transaction may choose between two
different statutes of limitation under the West Virginia Consumer
Credit and Protection Act (hereinafter "WVCCPA"): either the
four-year period commencing with the date of the transaction or
within one year of the due date of the last payment, whichever is
later." Dunlap v. Friedman's, Inc., 582 S.E.2d 841, 846 (W. Va.
2003) (Davis, J., dissenting) (internal quotations and citations
omitted).  Given this straightforward pronouncement by West
Virginia's highest court on the statute of limitations issue,
BNY's failure to even mention Dunlap in its reply brief is
troubling.

W. Va. Code § 46A-6-106(b).   Plaintiffs admit they did not send the mandatory notice required by the statute.   They attempt to justify their failure to do so by contending that (1) because they are suing BNY as the assignee rather than the seller, they are not required to comply with the requirements found in W. Va. Code § 46A-6-106(b); and 2) because JEB is a dissolved corporation it is impossible to provide the mandatory notice.

"[C]ourts must construe statutes as written, [and] not add words of their own choosing."   <u>Ignacio v. United States</u>, No. 10-2149, 2012 WL 887594, *2 (4th Cir. Mar. 16, 2012) (quoting <u>Barbour v. Int'l Union</u>, 640 F.3d 599, 623 (4th Cir. 2011) (en banc) (Agee, J., concurring in the judgment)).   In this case, plaintiffs cannot get around the plain language of the statute which contains no exceptions to the requirement that notice be provided to the seller before bringing an action under the WVCCPA.   <u>Mylan Pharm., Inc. v. FDA</u>, No. Civ. A. 104CV242, 2005 WL 2411674, *6 (N.D.W. Va. Sept. 29, 2005) ("Simply, when the words of a statute are unambiguous, `judicial inquiry is complete.'"). As the Supreme Court has stated:

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others.   We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.

<u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992).

Given that federal courts must apply state law as it exists, see Burris Chem., Inc. v. USX Corp., 10 F.3d 243, 247 (4th Cir. 1993), plaintiffs fail to indicate which West Virginia statute or decision of the West Virginia Supreme Court of Appeals alters the plain language of W. Va. Code § 46A-6-106(b) to create the exceptions to the mandatory notification provision they argue should apply in this case.  As a federal court sitting in diversity, this court is bound to apply the statute as written and cannot create exceptions to a West Virginia statute even if it were to conclude the legislature's failure to do so was an oversight.  See MCI Construction, LLC v. Hazen and Sawyer, P.C., 213 F.R.D. 268, 272 (M.D.N.C. 2003) ("This Court cannot extend or create North Carolina law and it will be up to the courts of North Carolina or the North Carolina General Assembly to make any necessary changes or interpretation to create an exception . . . ."); Recreation Servs., Inc. Benefit Plan v. Utah Mortgage Co., 735 F. Supp. 856, 861 (N.D. Ill. 1990) ("Since this court presides over this case solely by its diversity jurisdiction, the court hesitates to create exceptions to Illinois statutes absent some argument that the Illinois Supreme Court would concur.").

Plaintiff's assertion that they are excepted from providing the required notice because BNY is an assignee rather than a seller is without merit.  The statute does not create an assignee exception nor does the law regarding assignee rights

suggest one is appropriate.  "When there is an assignment of contract rights, the assignee obtains its rights from the assignor and, thus, stands in the shoes of the assignor and acquires the same rights and liabilities as if it had been an original party to the contract."  <u>Women in Military Service for America Memorial Foundation, Inc. v. Hartford Fire Ins. Co.</u>, 21 Fed. Appx. 186, 192, 2001 WL 1334179, *4 (4th Cir. Oct. 30, 2001); <u>see also</u> <u>State v. Scott Runyon Pontiac-Buick, Inc.</u>, 461 S.E.2d 516, 526 n.14 (W. Va. 1995) ("In essence, the assignee is standing in the shoes of the seller."); <u>Lightner v. Lightner</u>, 124 S.E.2d 355, 362 (W. Va. 1962) ("[An] assignee acquires no greater right than that possessed by his assignor, and he stands in his shoes."); <u>Lemley v. Phillips</u>, 169 S.E.2d 789, 790 (W. Va. 1933) ("In general, an assignee stands in the shoes of his assignor.").

Plaintiffs' argument that they are excused from providing notice to the seller because it would be impossible to do so fares no better.  The statute does not create such an exception nor have plaintiffs shown conclusively that providing notice to JEB was impossible.  A "federal court[] sitting in diversity rule[s] upon state law as it exists and do[es] not surmise or suggest its expansion."  <u>Burris Chem., Inc. v. USX Corp.</u>, 10 F.3d 243, 247 (4th Cir. 1993).

Based on the foregoing, the court GRANTS BNY's motion for summary judgment as to Counts Seven and Eight.[13]

---

[13] Even if Mrs. McCoy was not barred from bringing her claims based upon her failure to comply with W. Va. Code § 46A-6-106(b), her claims under the WVCCPA would still be subject to dismissal. Mrs. McCoy testified that she remembers very little about the transaction at issue in this case.  Specifically, she testified:

Q:   Can you or do you remember that the transaction wherever you decided to purchase the manufactured home?

A:   You know, vaguely.  I remember being there as a cosigner, me and my husband and Melinda - - and I was telling Chris yesterday I don't remember him being there, but that is nothing strange for me. I am not good at remembering a lot of things.

* * *

Q:   Did you go with Melinda and her husband to look at the home?

A:   I don't remember.  I'm sorry.

* * *

Q:   How did you become involved, who approached you?

A:   Me and my husband - - it all happened really fast. The day we were in the office and after that, I swear, I don't know what took place, but I do remember vaguely, I did sign, but I just remember signing the papers as a cosigner.

Q:   Did anybody - - did they run a credit application for you, do you remember that?  Where they took down your financial information and your job history and things like that?

A:   I'm sorry.  I don't remember.  I don't remember.

* * *

Q:   Do you remember the substance of any conversations

32

E.     *Common Law Fraud and Misrepresentation*

        With respect to their fraud and misrepresentation claims,

plaintiffs assert the following:

> 64.   Defendant Dealer informed Plaintiffs that
>        the manufactured home was a good quality
>        home and that they would take care of any
>        problems Plaintiffs experienced with the
>        home.
>
> 65.   The information conveyed to Plaintiffs as
>        outlined specifically above was false.
>
> 66.   Plaintiffs relied upon Defendant's
>        representations in making their decision to
>        purchase the new manufactured home.
>
> 67.   Plaintiffs were justified in relying upon
>        Defendant's representations in making their
>        decision to purchase the new manufactured
>        home.

First Amended Complaint ¶¶ 64-67.

---

>                that you had with Mr. Hatfield?
>
> A:    No, ma'am.  That's horrible.
>
> Q:    You think that you did talk to him when you were
>        purchasing the home?
>
> A:    You know, I don't remember what he said.  If I
>        remember what he said, I am sure I would remember
>        what I said, but, no, I do not remember our
>        conversation that day.

McCoy Depo. at 6-9, 31.  Because Mrs. McCoy cannot provide any
details about her dealings with J.E.B., she cannot prove her
claims as a matter of law.  See <u>Jones v. Home Loan Investments,
F.S.B.</u>, 718 F. Supp.2d 728, 737 (S.D.W. Va. 2010) (dismissing
plaintiff's WVCCPA claim because the plaintiff "state[d] that she
does not remember any of the transactions regarding the formation
of the loan.").

In its motion for summary judgment, BNY argues that plaintiffs cannot prevail on their claim for fraud and misrepresentation because: 1) Wanda McCoy cannot remember the substance of any conversations she had with JEB about the quality of the home; 2) the Justices were not damaged by any alleged fraud because they are not obligated on the contract; and 3) plaintiffs cannot prove materiality or reliance.

Under West Virginia law, the essential elements in a cause of action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.  Tri-State Asphalt Products, Inc. v. McDonough Co., 391 S.E.2d 907, 912 (W. Va. 1990) (quoting Lengyel v. Lint, 280 S.E.2d 66, Syl. pt. 1 (W. Va. 1981)).

Allegations of fraud must be established by clear and convincing proof.  See id.  According to the United States Court of Appeals for the Fourth Circuit: "[t]he burden of proving fraud is unquestionably heavy, Hunt v. Hunt, Trustee, 91 W. Va. 685, 114 S.E. 283, and it is also well established that one cannot rely blindly upon a representation without suitable investigation and reasonable basis. Buena Vista Co. v. Billmyer, 48 W. Va. 382,

37 S.E. 583." Elk Refining Co. v. Daniel, 199 F.2d 479, 482 (4th

Cir. 1952).

> And where both parties to a contract have equal
> means and opportunity to acquire information, so
> that by ordinary diligence either may rely on his
> own judgment, they will be presumed to have done
> so, and if not, they must abide by the
> consequences of their own folly or carelessness.

Tri-State Asphalt at 912-13 (quoting Jones v. McComas, 115 S.E.

456 (W. Va. 1922)).

The majority of the allegedly fraudulent statements

relied upon by plaintiffs are too vague to establish a cause of

action for fraud.  For example, in the Complaint, plaintiffs

contend that JEB represented the manufactured home at issue was

"a good quality home."  First Amended Complaint ¶ 64.  During his

deposition, Christopher Justice testified that JEB informed him

that metal roofs are "nice roofs."  C. Justice Depo. at 22-23.

Expressions of opinion that are of a vague and general character

cannot make out a claim for fraud.  See, e.g., Miller v.

PremierCorp., 608 F.2d 973, 981 (4th Cir. 1979) ("[A]n unspecific

and false statement of opinion such as occurs in puffing

generally cannot constitute fraud.").  See also Lewis v. Trustmark

Ins. Co., 1999 WL 486665 (4th Cir. 1999).  As the West Virginia

Supreme Court of Appeals has stated:

> Upon the authorities it may be laid down as a
> general rule that an expression of opinion or
> belief, if it is nothing more than this, and if
> so intended and understood, is not a
> representation of fact, and, though false, does

35

not amount to fraud.  A person ordinarily has no
right to rely upon such a statement, and if he does so he cannot
treat it as fraud, either for the purpose of maintaining an
action of deceit, or for the purpose of rescinding a contract at
law or in equity.  To furnish grounds for an action of deceit the
representation must be of a matter susceptible of approximately
accurate knowledge and must be in form and substance an assertion
importing knowledge on the part of the speaker.  A statement
which by reason of its form or subject-matter amounts merely to
an expression of opinion is not actionable, for it is one upon
which reliance cannot safely be placed.

McCormick v. Jordon, 63 S.E. 778, 780 (W. Va. 1909).

For this reason, fraud claims based upon allegations of

"good quality" and the like are routinely rejected.  See, e.g.,

Lambert v. Downtown Garage, Inc., 553 S.E.2d 714, 717 (Va. 2001)

("[C]ommendatory statements, trade talk, or puffing, do not

constitute fraud because statements of this nature are generally

regarded as mere expressions of opinion."); Watson v. Avon Street

Business Center, Inc., 311 S.E.2d 795, 798 (Va. 1984) ("In the

case before us, the only express representations concerning the

roof were made by Zerkel, the sellers' agent, to the effect that

it was a `25-year roof' and `a good roof.'  These statements . .

. are typical seller's talk, expressions of opinion insufficient

to frame a jury issue in an action for deceit.").

The only statement arguably specific enough to support a

claim for fraud/misrepresentation is the alleged "50-year

warranty".  However, given that the Purchase Agreement promised

only a 12-month warranty, any reliance on the alleged oral

promise of a 50-year warranty was not justified.  Relying on the

36

Restatement (Second) of Torts, the Supreme Court of Appeals of West Virginia has recognized that "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." Kidd v. Mull, 595 S.E.2d 308, 316 (W. Va. 2004) (quoting Restatement (Second) of Torts § 541 (1977)); see also C.J.S. Fraud § 55 (2012) ("A reliance on oral representations is unjustifiable for purposes of a fraud claim where a written agreement states a fact contradictory to the claimed representation."); AM. JUR. 2d Fraud and Deceit § 264 (2012) ("Thus, where an alleged misrepresentation is explicitly addressed and negated in a written agreement signed by the parties, any reliance on a contrary oral assertion is unreasonable as a matter of law.").

Furthermore, plaintiffs have failed to prove by clear and convincing evidence that the alleged misrepresentations about the roof had anything to do with the purchase of the home.  According to Melinda Justice: "And he told us - - I do remember him telling us about the roof because it didn't have the shingles and that was something different.  But I couldn't see the roof from where I was at.  I didn't care about the roof.  I couldn't look up, so I didn't care.  And I remember him saying that the roof had a warranty on it, but that's really all I recall."  M. Justice Depo. at 11-12 (emphasis added).

37

In their brief in response to BNY's Motion for Summary Judgment, plaintiffs contend: "Presumably, the dealer (who is in a better position to know) knew about the defective roof, concealed the defect from Plaintiffs in order to make a sale, all the while telling Plaintiffs that it would take care of any defects."  Plaintiffs' Response to BNY's Motion for Summary Judgment at 11-12.  Even assuming that the roof was defective when it was sold to the Justices (and this is a disputed issue), plaintiffs have offered no evidence to support their assertion that J.E.B. knew about any alleged defects.  Furthermore, West Virginia's highest court has made clear on more than one occasion, "[f]raud is never presumed and when alleged it must be established by clear and distinct proof." Gerver v. Benavides, 530 S.E.2d 701, 705 (W. Va. 2000) (quoting Bennett v. Neff, 42 S.E.2d 793, Syllabus Point 5 (W. Va. 1947)).  Based on the foregoing, this court cannot "presume" the existence of fraud.

Finally, as to Mrs. McCoy, it is obvious that plaintiffs cannot establish a case of fraud by clear and convincing evidence as to any of the elements.  In her deposition, Mrs. McCoy testified that she could not remember her conversations with J.E.B. related to the purchase of the home.  Therefore, she cannot claim in this proceeding that she relied to her detriment on a false representation if she cannot even remember any representation made to her.  See Basham v. Gen. Shale Prods.

38

Corp., 989 F.2d 491, 1993 WL 65086, at *4 (4th Cir. Mar. 10, 1993) (affirming summary judgment on fraud claim based upon the appellants' concession that they "cannot now, fifteen years or more after the sales, remember what conversations occurred between the . . . sellers and themselves"). Accordingly, BNY is entitled to summary judgment on the fraud claims of Mrs. McCoy.

To the extent that plaintiffs have attempted to assert new fraud claims in their response to BNY's motion for summary judgment, their attempt fails. "A plaintiff cannot rely on a response to a motion for summary judgment to act as an amendment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment." Martin v. Mathena, Civil Action No. 7:11-cv-00010, 2012 WL 43609, *6 (W.D. Va. Jan. 9, 2012); see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 Fed. Appx. 556, 2008 WL 238562, *6 (4th Cir. Jan. 29, 2008) (and authorities cited therein).

IV.   Conclusion

Based on the foregoing, BNY's motion for summary judgment was **GRANTED**. Plaintiffs' Motion for Relief from Order, (doc. # 122), is **DENIED**.

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

**IT IS SO ORDERED** this 23rd day of April, 2012.

ENTER:

David A. Faber
Senior United States District Judge